**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE SHLOMO LEVI,**<br><br>                    **Debtor.** | **Chapter 7**<br><br>**Case No. 16-10837 (MEW)** |
| **JIL MAZER-MARINO, CHAPTER 7 TRUSTEE FOR SHLOMO LEVI,**<br><br>                    **Plaintiff,**<br><br>             **-against-**<br><br>**SHLOMO LEVI,**<br><br>                    **Defendant.** | <br><br><br><br>**Adv. Proc. No. 17-01021 (MEW)** |

**MEMORANDUM OPINION REGARDING CHAPTER 7**
**TRUSTEE'S  ACTION OBJECTING TO THE DEBTOR'S DISCHARGE**

A P P E A R A N C E S :
Jil Mazer-Marino
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
990 Stewart Avenue, Suite 300
P.O. Box 9194
Garden City, New York 11530-9194
    *Chapter 7 Trustee*

Shlomo Levi
    *Pro Se*

**MICHAEL E. WILES**
**United States Bankruptcy Judge**

        Shlomo Levi filed a chapter 7 bankruptcy petition on April 7, 2016.  Entities known as

AF-1 LLC, AF-22 LLC, Espresso Management Holding, Inc., Espresso Stores, Inc. and F-6

Chelsea, Inc. (collectively, the "**Franchisee Debtors**") filed chapter 11 bankruptcy petitions in

August 2016.  Plaintiff Jil Mazer-Marino is the chapter 7 Trustee appointed in Levi's and the

Franchisee Debtors' cases.  The Trustee alleges, pursuant to 11 U.S.C. §§ 727(a)(2) and (a)(4)(A),

that Levi's debts (which amount to at least $2 million) should not be discharged for two independent reasons. First, she alleges that Levi concealed property both before and after the filing of his bankruptcy petition and that he did so with the intent to hinder, delay, or defraud a creditor or the Trustee. Second, she alleges that Levi knowingly and fraudulently made a false oath in or in connection with his bankruptcy case. Levi denies both allegations.

This opinion follows a trial that was held on October 30, 2017. The sole witness at the trial was Levi. The Court has considered the stipulated facts, Levi's Answer, the exhibits and testimony admitted at the trial, and Levi's credibility in making the factual findings set forth in this opinion.

## JURISDICTION AND POWER TO ISSUE A FINAL DECISION

The parties have agreed that this Court has subject matter jurisdiction over this adversary proceeding and the Complaint, and personal jurisdiction over the parties. In addition, the parties agree that the Court has subject matter jurisdiction under 28 U.S.C. §§ 157(b)(2)(J) and 1334(b). This matter is a core proceeding and raises issues regarding the availability of a discharge on which the Court may enter a final decision.

## FACTUAL BACKGROUND

Before 2008, Levi borrowed money from a business partner and friend named Shimon Skurry. The promissory note obligated Levi to repay more than $800,000 to Skurry. Levi, however, was unable to repay the debt. Skurry sued Levi in 2008, at which point extensive litigation ensued. Skurry prevailed, obtaining a judgment against Levi in the amount of more than $2 million. The details are not clear, but Levi acknowledges that Skurry aggressively attempted to collect the outstanding judgment. PTO Annex C ¶ 41 (Levi stipulating that "[s]ince 2014, [Skurry] has aggressively attempted to collect the amounts he is owed by [Levi]").

While the dispute with Skurry was ongoing, in or around late 2012, Levi attended a trade show in Chicago where he came across Gruppo Industriale Filicori-Zecchini S.p.A., a company in

the business of roasting and selling coffee under the Filicori Zecchini trademark.  Based on that

encounter, Levi came up with the idea to operate coffee stores under the Filicori brand in New

York City.  Two of the Franchisee Debtors, AF-1 LLC and AF-22 LLC, then entered into franchise

agreements with Filicori.  Levi admittedly formed the two limited liability companies, and Levi

negotiated and executed the franchise agreements with Filicori.  The signature pages of the

franchise agreements identify Levi as a "member" of AF-1 LLC and AF-22 LLC.  PX 19; PTO

Annex A ¶¶ 45, 47.  In addition, in each franchise agreement the parties agreed that the individual

designated as a "principal" in Exhibit C to the agreement would devote all of his time and energies

to the performance of the franchisees' duties under the agreements and that he "shall not . . . be

connected with or concerned in any other business, competing or noncompeting with [Filicori]."

PX 19.  Each Exhibit C, in turn, listed one person—Levi—and each referred to Levi as the

"principal" with a 51% ownership interest in the relevant franchisee.  *Id.*; PTO Annex A ¶¶ 46, 48.

In or around 2015, after Skurry obtained the $2 million judgment referenced above, Levi

decided to open additional coffee stores.  Levi caused the formation of three other companies:

Espresso Management Holding, Inc. ("Espresso Management Holding"), Espresso Stores, Inc.,

and F-6 Chelsea, Inc.  On March 23, 2015, Espresso Management Holding entered into a franchise

agreement with Filicori, which allowed Espresso Management Holding to operate a coffee shop

under the "Filicori" trademark.  In September 2015 and December 2015, Espresso Stores, Inc. and

F-6 Chelsea, Inc., respectively, entered into franchise agreements with Filicori, which allowed

them to operate coffee shops under the "Filicori" trademark.

The agreements for Espresso Management Holding, Espresso Stores, Inc., and F-6 Chelsea,

Inc. were negotiated and executed by Levi.  Unlike the agreements for AF-1 LLC and AF-22 LLC,

these three agreements do not identify Levi as a "member" nor list his specific ownership interest

in the companies.  However, like the two earlier agreements, the later franchise agreements refer to Levi as the "principal" who is obligated to spend all his time and energy on the performance of the franchisees' duties under the contracts and who is precluded from engaging in any other business, whether competing or noncompeting with Filicori.  PX 19.  In addition, the agreement for Espresso Stores, Inc. identifies Levi as "presedent" *[sic]*.  *Id.*  That notation appears next to Levi's signature and was made in handwriting.

It is not clear whether Levi received cash or other property directly from the Franchisee Debtors once they began to operate stores.  However, it is admitted that AF-1 LLC (and other companies acting with and for it) made payments directly to Levi's landlord as rent for his family's Manhattan apartment, and payments to other third parties to pay personal expenses of Levi, including eventually his legal fees.

Levi filed his bankruptcy petition on April 7, 2016.  He also filed certain legally mandated written disclosures (together with the bankruptcy petition, the "**Written Disclosures**"), including a Statement of Financial Affairs, a Summary of Assets and Liabilities, and related schedules. ECF Nos. 1, 4 and 5.  Levi declared under penalty of perjury that the Written Disclosures were true and correct.  (ECF Nos. 1 at page 6, 4 at page 21, and 5 at page 7.)  Among other things, Levi represented that, on the date of the filing of the petition:

- His assets were limited to (i) less than $4,000 in personal property; and (ii) a 50% membership interest in FDB 124, LLC (a hotel business), which he indicated had no value (ECF No. 4 at pages 1, 4-6);

- He had worked as a manager of AF-1 LLC for "2 years" and, as of the date of his bankruptcy filing, received gross monthly wages of about $4,000 (ECF No. 4 at p. 17);

4

- He had no interest in any other incorporated or unincorporated businesses, whether LLCs, partnerships, or joint ventures (ECF No. 4 at page 5 (listing only FDB 124, LLC in response to a question calling for disclosure of any such interests)); and

- His liabilities included over $2 million in non-contingent liabilities (including the $2,219,530 judgment obtained by Skurry) and $40 million in contingent liabilities arising mainly from guaranteeing loans to other parties (ECF No. 4 at pages 11-14).

With regard to his historical income and financial affairs, Levi disclosed under oath that:

- In the first three months of 2016, his total income was $12,000 (ECF No. 5 at page 1);

- In the two calendar years before his bankruptcy (2014 and 2015), he had gross income of $50,000 each year (ECF No. 5 at pages 1 and 2); and

- In the four years before filing for bankruptcy, he had been a member of the previously mentioned 124 FDB, LLC and also Espresso Dream, LLC (which he identified as an espresso bar), but otherwise had had no connections to any business, whether as a "a member of a limited liability company (LLC) or limited liability partnership (LLP), a partner in a partnership, an officer, director, or managing executive of a corporation, [or] an owner of at least 5% of the voting or equity securities of a corporation."  (ECF No. 5 at pages 6-7)

Nowhere in the Written Disclosures did Levi mention AF-22 LLC, Espresso Management Holding, Inc., Espresso Stores, Inc. or F-6 Chelsea Inc., even though he admitted at the trial that he had devoted all of his time and energy to the running of the stores owned by those entities. Although Levi's Written Disclosures revealed a connection to AF-1 LLC, they merely stated that

Levi was employed by AF-1 LLC as a "manager," and failed to disclose any ownership or other connection. ECF No. 4 at page 17 and *passim*; ECF Nos. 1 and 5.

The relevant forms also required Levi to report his non-filing spouse's "monthly gross wages, salary, and commissions." ECF No. 4 at page 17. In response to that question, Levi listed "N/A" for "not applicable." ECF No. 4 at pages 17-18. Levi also failed to answer the question of whether or not his wife was "Employed" or "Not employed." *Id.*

On May 7, 2016, approximately a month after filing the petition and the other Written Disclosures, Levi gave sworn testimony at a meeting of creditors pursuant to section 341 of the Bankruptcy Code. 341 Meeting Tr. (PX 15.) Levi testified about his employment by AF-1 LLC, his wife's employment, the payment of his legal fees (they had been paid by an entity named Lola 8 West Ltd.), as well as his past involvement with various businesses. He stated under oath that he was not employed by anyone other than AF-1 LLC (PX 15 at 19:22-25); that AF-1 LLC was a "management company" that "managed the café, for the investors" (PX 15 at 14:13-16); that as an employee of AF-1 LLC, he performed the role of a "district manager for coffee . . . stores;" that he had been a full time employee of AF-1 LLC for "like eight, nine months" (PX 15 at 11:25-12:3; 15:3-6); and that prior to that, he had worked for AF-1 LLC on a part-time basis. Although Levi's testimony revealed the existence of multiple coffee stores, he gave the impression that they were run by the single company AF-1 LLC, of which he was a mere employee.

Levi was asked, at the creditor meeting, to list the owners of AF-1 LLC. He answered under oath that he was "not sure [who owns AF-1 LLC]. But it's my – investors from Israel . . . which is my family and my wife's family. My mother, my mother-in-law, and my uncle, people that put money in order to make it happen. It's like my list of family investors may be like six of

them. . . . But I don't know how many really in the paperwork. But maybe they are all under one family member, back up with – in Israel. I don't know." PX 15 at page 18.

Levi also testified that his wife was employed by AF-1 LLC. PX 15 at 11:10:24; 8:6-15. Specifically, he testified that she was a "part-time volunteer, part-time employee, in managing a café." *Id.* Asked about his wife's salary, he stated: "It's basically $1,000, something like that, for every two weeks, or something. She's a part-time, so she helps me." PX 15 at 9:2-9. In addition, Levi testified that his wife's family provided financial support for the couple. PX 15 at 20:1-10.

When asked why Lola 8 West paid his legal fees, Levi testified that there was a connection between Lola 8 West and AF-1 LLC, though he was not clear as to the nature of the connection. PX 15 at 41:25-42:12. He said that Lola 8 West gave "money to the company that have the café. It's a friend's, like, kind of finance company that friends – between friends, like, kind of finance company that friends – between friends, and give us money for the café. The café doesn't make money. So, this is – I'm getting money from the company. And this is how we get money. But it's not something that – we need to ask Moshe Maman that. He's the guy that's dealing with that." *Id.* Levi then continued: "But AF1 [AF-1 LLC] took money from them and managed the money between Moshe Maman, which is managing the company. He's giving the money from whatever accounts he find. Lola 8 West, the guy is – they have a lot of money. And he helps. We're taking money from him. Not me, I don't want to say me. But we – I know that we're taking money from him, giving back to finance the company to move, like, kind of loan or whatever, So --." PX 15 at 42:19-43:1.

Finally, Levi testified that he did not have to repay Lola 8 West "because I'm getting money from the company . . . from AF1." PX 15 at 42:13-19. Levi did not identify any services for which he would be entitled to receive money except for his operation of the Franchisee Debtors. At the

trial of this matter, Levi confirmed that the financial obligations of AF-1 LLC and other Franchisee Debtors were frequently satisfied by Lola 8 West.

It became clear during the 341 meeting, and Levi now admits, that compensation for his services was not always paid to him directly.  PX 15 at 10:12-23.  Instead, AF-1 LLC and Lola 8 West (apparently on AF-1's behalf) were directed by Levi to make monthly rent payments of approximately $4,900 for the apartment that Levi and his family occupied in midtown Manhattan. Levi testified that the same practice was employed with regard to his other personal expenses. Levi has also stipulated that since approximately 2011 he has not had a bank account in his name or held any other assets in his name.  Annex A to the PTO, ¶ 42.  At the trial, he testified that he stopped having personal bank accounts in order to prevent his creditors from accessing his assets.

The Franchisee Debtors filed their chapter 11 bankruptcy petitions about four months after Levi filed his chapter 7 petition.  Levi executed the Franchisee Debtors' bankruptcy petitions, the certificates of resolutions authorizing the filings, and the sworn declaration in support of the bankruptcy petitions.  Case No. 16-12413 (Espresso Management Holding, Inc. and AF-22 LLC) ECF Nos. 1, 2; Case No. 16-12414 (Espresso Stores, Inc.) ECF Nos. 1, 2; Case No. 16-12415(AF-1 LLC), ECF Nos. 1, 2; Case No. 16-12417(F-6 Chelsea, Inc.) ECF Nos. 1, 2.  In the declaration, Levi stated that the Franchisee Debtors filed for bankruptcy in order to stay a Warrant for Closing to Enforce Injunction issued by the New York State Court in August 2016 in a lawsuit brought by Filicori, in which Filicori alleged breach of contract and other claims against the Franchisee Debtors.  *E.g.*, Case No. 16-12413 (Espresso Management Holding, Inc. and AF-22 LLC) ECF No. 2 ¶¶ 8-9.

In the written disclosures that Levi executed under oath in the Franchisee Debtors' cases within the next two months, Levi stated that, on the date of the petitions, he was the only person

8

in possession of each of the Franchisee Debtors' books and records, and identified only himself in the space that required him to list "the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of [the] case."   Case No. 16-12413 ECF No. 24 at page 6 (Espresso Management Holding, Inc.), ECF No. 26 at page 6 (Espresso Stores, Inc.), ECF No. 28 at page 6 (F-6 Chelsea, Inc.), ECF No. 30 (AF-1 LLC) at page 6, ECF No. 32 (AF-22 LLC) at page 6.   The Franchisee Debtors' cases were not filed as cases related to Levi's personal bankruptcy case, but the matters later were consolidated when the Court was later advised of the connections to Levi's pending case.   After the Franchisee Debtors' cases were converted to Chapter 7 cases, the Plaintiff was then appointed to serve as the chapter 7 trustee in the Franchisee Debtors' bankruptcy cases as well.

## THE PARTIES' POSITIONS

Levi consented to extensions on the deadline to object to the discharge of Levi's debts. ECF No. 17, 21, 29, 33, 40.   The Trustee then filed this adversary proceeding in which she asserts that, pursuant to Sections 727(a)(2) and 727(a)(4)(A) of the Bankruptcy Code, Levi is ineligible for the discharge of his debts because: (i) he concealed his interests in the Franchisee Debtors and the income he derived from their operations both before and after the filing of his bankruptcy petition; and (ii) he made false sworn statements concerning his equitable interest in the Franchisee Debtors and his household income (specifically by failing to disclose his wife's income of approximately $2,000 a month in his Written Disclosures).

It should be noted that the Trustee did not assert a false oath allegation in the complaint but the issue was tried without any objection by Levi.   Therefore, the Court will consider both claims as if they were both included in the complaint.   *See* Fed. R. Civ. P. 15(b)(2) (made applicable in

this adversary proceeding per Rule 7015 of the Federal Rules of Bankruptcy Procedure) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.").

Levi takes the position that he has no interests in the Franchisee Debtors and that, if the Court were to find that he did own such an interest, he did not conceal it. *E.g.*, PTO Annex C. In addition, Levi testified that he did not act with the intent to hinder, delay, or defraud any creditors or the Trustee. With regard to his failure to list his wife's income in his Written Disclosures, Levi states he was advised by the attorney who represented him at that time that the requirement to disclose his wife's income was "potentially unconstitutional" and that, in any case, Levi made disclosures shortly after the omission. PTO Annex C ¶ 10.

## THE APPLICABLE LEGAL STANDARDS

Chapter 7 of the Bankruptcy Code is designed to provide individual debtors the opportunity for a "fresh start" through the discharge of personal liability for pre-petition debts. To that end, Section 727(a) states that the Court "shall grant the debtor a discharge" unless one of the exceptions enumerated in the statute apply. 11 U.S.C. § 727(a). Because a denial of discharge is a harsh sanction, Section 727(a) "must be construed strictly against [the Trustee] and liberally in favor of [Levi]." *See In re Chalasani*, 92 F.3d 1300, 1310 (2d Cir. 1996) (internal quotation marks omitted); *Gordon v. Tese Milner (In re Gordon)*, 535 B.R. 531, 535-36 (S.D.N.Y. 2015). At the same time, "the discharge of a bankrupt from his debts is a privilege . . . that has been granted by Congress upon such terms as it has seen fit to impose," and "[a]mong these terms is the requirement that debtors act in good faith and provide full and honest disclosure." *In re Gordon*, 535 B.R. at 535-36 (internal citations omitted); *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1589 (2016) ("§ 727(a)(2) is a . . . remedy for actions that hinder the entire bankruptcy process").

The Trustee bears the burden of proving by the preponderance of the evidence that a discharge should be denied based on one or more of the exceptions set forth in the statute. *Grogan v. Garner*, 498 U.S. 279, 287 (1991) ("The party objecting to discharge must establish those elements by a preponderance of the evidence."); *In re Gordon*, 535 B.R. at 536 (the burden of proof is preponderance of the evidence). Here, the Trustee invokes sections 727(a)(2) and 727(a)(4)(A) as grounds on which she contends a discharge should be disallowed. PTO at 1.

A.    **Section 727(a)(2)**

Section 727(a)(2) of the Bankruptcy Code precludes discharge when "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title [such as the Trustee], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed— (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition." 11 U.S.C. § 727(a)(2). The Trustee alleges that Levi concealed his property before the date of the filing of the petition and property of the estate after that date.

To prevail on her concealment claim under Section 727(a)(2)(A), the Trustee must show that (i) the property at issue belonged to Levi; (ii) he concealed it; (iii) he did so with the intent to hinder his creditors, delay them, or defraud them; and (iv) he either did so within one year before the date of the filing of the petition or his initial act of concealment took place before this one-year period but he then allowed the property to remain concealed into the critical year. *See In re Boyer*, 328 Fed. App'x 711, 714-15 (2d Cir. 2009) (internal citations omitted); *In re Shah*, No. 07-13833, 2010 WL 2010824, at *7 (Bankr. S.D.N.Y. May 13, 2010). The elements of a concealment claim under Section 727(a)(2)(B) are the same, except the Trustee must show that the property that was

11

concealed constituted property of Levi's estate and that the act of concealment took place after the date of the filing of the petition. *See* 11 U.S.C. 727(a)(2)(B).

The Bankruptcy Code does not specify what constitutes "property of the debtor" for purposes of section 727(a)(2)(A), and so courts have looked to state law to determine what constitutes an interest in property. *Kaufman v. Chalk & Vermilion Fine Arts, LLC*, 31 Fed. Appx. 206, 208 (2d Cir.2002). "Among other things, an asset is any form of personal property with value . . . not exempt from liability by statute or common law." *Ng v. Adler (In re Adler)*, 494 B.R. 43, 62 (Bankr. E.D.N.Y. 2013) (internal citations omitted). In this regard, "property of the debtor" includes all forms of tangible and intangible assets under state law. *In re Adler*, 494 B.R. at 62-63.

On the other hand, "property of the estate," as that term is used in section 727(a)(2)(B), is defined in the Bankruptcy Code. With certain exceptions that are not applicable here, the bankruptcy estate broadly includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). While broad, the definition of property of the estate is not without bounds. The language of Section 541(a) is "sufficiently circumscriptive" to exclude "property in which the debtor has [merely] a derivative interest." *Mcorp Mgmt. Sols., Inc. v. Thurman (In re Thurman)*, 901 F.2d 839, 841 (10th Cir. 1990). More particularly, "Congress intended to limit the reach of § 727(a)(2)(A) only to those transfers of property in which the debtor has a direct proprietary interest." *In re Thurman*, 901 F.2d at 841.

"Concealment" has most frequently been found where a debtor transfers legal title to property to a third party while retaining a secret interest in that property. *In re Silverstein*, 151 B.R. 657, 661 (Bankr. E.D.N.Y. 1993) (internal citations omitted). "Concealment" also happens when a debtor "plac[es] assets beyond the reach of creditors or withhold[s] pertinent information" when he has a legal duty to disclose it. *See, e.g.*, *In re Shah*, No. 07-13833, 2010 WL 2010824, at

*7 (Bankr. S.D.N.Y. May 13, 2010) (internal citation omitted).  Record title is not determinative of a debtor's equitable ownership. *Id.* (citing *In re Berman*, 100 B.R. 640 (Bankr. E.D.N.Y.1989) (where equitable ownership in the debtor was determined to exist after the debtor transferred his interest in his home to his wife but continued to use the residence)).  For example, when a debtor makes all mortgage, insurance, and maintenance payments on and lives in property owned by another, he may be found to have fraudulently concealed his interest in the property by maintaining it in another person's name. *Id.* (citing *In re Martin*, 698 F.2d 883 (7th Cir.1983)).

The section 727(a)(2) exceptions to discharge apply only if property was concealed with the actual intent to hinder, delay, or defraud creditors or the Trustee. *In re Gordon*, 535 B.R. 531, 536 (S.D.N.Y. 2015).  Actual fraud involves "moral turpitude" and connotes "deceit, artifice, or trick which involves a direct and active operation of intellect which is designed to mislead." *E.g.*, *In re Pommerer*, 10 B.R. 935, 939 (Bankr. D. Minn. 1981).  But given the disjunctive phrasing of the statute, proof of intent to hinder or delay is sufficient. *Matter of Bowyer*, 916 F.2d 1056, 1059-60 (5th Cir. 1990) ("[T]the term "defraud" does not subsume "hinder or delay.""), *rev'd on other grounds on reh'g*, 932 F.2d 1100 (5th Cir. 1991).  The statute does not define an intent to "hinder" or an intent to "delay," but courts have held that a debtor acts with an intent to "hinder" if he or she acts with "an intent to impede or obstruct" creditors and an intent to "delay" if he or she acts with "an intent to slow or postpone creditors." *In Re Wiggains*, No. 13-33757, 2015 WL 1954438, at *17 (Bankr. N.D. Tex. Apr. 28, 2015), *aff'd sub nom. Matter of Wiggains*, 848 F.3d 655 (5th Cir. 2017).  Other courts have stated more generally that to act with "intent to hinder or delay" is to "act improperly to make it more difficult for a creditor to collect a debt." *In re Womble*, 289 B.R. 836, 854 (Bankr. N.D. Tex.) ("Case law treats 'intent to hinder or delay' as an intent to improperly make it more difficult for creditors to reasonably collect on their debts."), *aff'd sub*

*nom. Womble v. Pher Partners*, 299 B.R. 810 (N.D. Tex. 2003), *aff'd sub nom. In re Womble*, 108 Fed. App'x 993 (5th Cir. 2004). These interpretations of the statute are consistent with ordinary dictionary definitions of the terms "hinder" and delay."[1]

Whether a debtor acts with "actual intent to hinder, delay, or defraud" is a fact-specific inquiry. However, some courts have held that incorrect statements on schedules can amount to proof of fraudulent intent. *Congress Talcott Corp. v. Sicari (In re Sicari)*, 187 B.R. 861, 871 (Bankr. S.D.N.Y.1994); *Friedman v. Sofro (In re Sofro)*, 110 B.R. 989, 991 (Bankr. S.D. Fla. 1990) ("The intent to hinder, delay, or defraud a creditor [under § 727(a)(2)(A)] may be imputed to a debtor where the debtor fails to make a full disclosure of his liabilities in the petition for relief and omits assets of substantial value from the Schedules.").[2] An otherwise innocent motive can coexist with the intent to hinder or delay creditors. *Rupp v. Pearson*, 658 Fed. App'x 446, 450-51 (10th Cir. 2016) (citing *First Beverly Bank v. Adeeb* (*In re Adeeb*), 787 F.2d 1339, 1343 (9th Cir. 1986) (debtor who transferred property "intend[ing] to protect the property from one creditor for the benefit of the other creditors" nevertheless intended to hinder or delay a creditor under § 727(a)(2)(A))).

---

[1]   According to the Oxford English Dictionary, the term "hinder" means to "keep back, delay; impede; obstruct; prevent." It defines "delay" as "put off to a later time; postpone, defer." Webster's online dictionary defines "hinder" as "to make slow or difficult the progress of," "to hold back," or "to delay, impede, or prevent action." *See also United States ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester Cty.*, No. 06 CIV. 2860 (DLC), 2016 WL 3004662, at *18 (S.D.N.Y. May 24, 2016), *aff'd* 689 F. App'x 71 (2d Cir. 2017).

[2]   *But see Jensen v. Slater (In re Slater)*, 318 B.R. 881, 886-87 (Bankr. M.D. Fla. 2004) ("While errors on the Chapter 7 debtors schedules may be sufficient to warrant to a denial of the debtors' discharge on the grounds of 'false oaths' it is not based on concealment." (internal citation omitted)).

### B.   Section 727(a)(4)(A)

Section 727(a)(4)(A) of the Bankruptcy Code states that the court shall deny a discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."  11 U.S.C. § 727(a)(4)(A).  To meet her burden under Section 727(a)(4)(A), the Trustee must prove that "(1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case."  *In re Boyer*, 328 F. App'x 711, 715 (2d Cir. 2009) (citing *Keeney v. Smith* (*In re Keeney*), 227 F.3d 679, 685 (6th Cir. 2000)); *Vidomlanski v. Gabor (In re Gabor)*, No. 06-1916, 2009 WL 3233907, at *7 (Bankr. S.D.N.Y. Oct. 8, 2009).

The bankruptcy petition and schedules of a debtor are statements under oath.  *Gabor*, 2009 WL 3233907, at *7; *Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 320 (Bankr. S.D.N.Y. 1994). Testimony at a section 341 meeting also qualifies as a statement under oath for purposes of § 727(a)(4)(A).  *Moreo v. Rossi (In re Moreo)*, 437 B.R. 40, 61 (E.D.N.Y. 2010).

Fraudulent intent must be shown by demonstrating actual fraud, not constructive fraud. *In re Moreo*, 437 B.R. 40, 62 (E.D.N.Y. 2010).  The party objecting to a discharge based on the omission of information in a sworn statement must show that the information was omitted for the specific purpose of perpetrating a fraud and not simply because the debtor was careless or failed to fully understand an attorney's instructions.  *In re Moreo*, 437 B.R. 40, 62 (E.D.N.Y. 2010). However, "[a] reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may rise to the level of fraudulent intent necessary to bar a discharge."  *In re Irving*, 27 B.R. 943, 946 (Bankr. E.D.N.Y. 1983); *see also In re Tully*, 818 F.2d 106, 111 (1st Cir. 1987) ("[I]t is well settled that reliance upon advice of counsel

15

is, in this context, no defense where it should have been evident to the debtor that the assets ought to be listed in the schedules."); *Diorio v. Kreisler-Borg Constr. Co.*, 407 F.2d 1330, 1331 (2d Cir. 1969) ("Successful administration of the Bankruptcy Act hangs heavily on the veracity of statements made by the bankrupt . . . . [R]eckless indifference to the truth . . . is the equivalent of fraud.").

A false oath must have related to a material matter in order to justify the denial of a discharge. *In re Boyer*, 328 F. App'x 711, 715 (2d Cir. 2009). A false statement or omission is material if it "bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *In re Gordon*, 535 B.R. 531, 538 (S.D.N.Y. 2015) (internal citations omitted) (also noting that "[i]t is well settled in the Second Circuit that '[m]ateriality does not require a showing that the creditors were prejudiced by the false statement'"); *Tully*, 818 F.2d at 110-11; *see also In re Robinson*, 506 F.2d 1184, 1188 (2d Cir. 1974) ("Materiality does not require a showing that the creditors were prejudiced by the false statement."). A collection of false statements may be material in the aggregate, even if individually they would be less significant. *In re Irving*, 27 B.R. 943, 946 (Bankr. E.D.N.Y. 1983) ("otherwise immaterial falsehoods or omissions can aggregate into a critical mass substantial enough to bar a debtor's discharge") (citations omitted).

## ANALYSIS OF THE CONCEALMENT CLAIMS

The preponderance of the evidence at trial shows that Levi concealed (a) his interest in the Franchise Debtors, and his income from those businesses, within one year of filing his chapter 7 petition, and (b) his interests in the Franchisee Debtors after filing his chapter 7 petition. Furthermore, he did so with the actual intent to hinder or delay creditors and/or the trustee.

A.     **Pre-Bankruptcy Concealment**

The Court finds, based on the following facts, that Levi had ownership interests in the Franchisee Debtors, and that his current efforts to deny those interests are not credible:

- Levi admittedly caused each of the Franchisee Debtors to be formed.   PTO Annex C ¶ 43.

- Levi admittedly negotiated and executed each of the relevant franchise agreements. PTO Annex C ¶¶ 45, 47, 50, 53, 56.

- Levi was the only representative of the Franchisee Debtors that met with Filicori before the parties entered into the franchise agreements.

- Levi also signed—on behalf of another entity, Espresso Dream LLC (no longer at issue in the Trustee's case)—the leases for the five premises where the Franchisee Debtors operated their coffee shops.  PTO Annex C, at ¶ 62.

- In 2012, on the signature pages of two of the five franchise agreements, Levi represented himself to be a "member" of AF-1 LLC and AF-22 LLC and a principal and owner of a 51% interest in AF-1 LLC and AF-22 LLC.  PTO Annex C ¶¶ 45-48; PX 19.

- The three franchise agreements signed in 2015, after Skurry had obtained and begun to pursue a judgment against Levi, do not refer to Levi as a member and do not identity the extent of his ownership of those companies, but they do refer to him as "principal."  *Id.* at ¶¶ 51, 54, 57.  In addition, Espresso Stores, Inc.'s agreement also was signed by Levi as President.  PX 19 (ECF No. 13-6 at page 135 of 162).

- In the Franchisee Debtors' Schedules (filed several months after his own schedules), Levi listed himself—and only himself—as the person with possession

of the Franchisee Debtors' books and records.  Case No. 16 12413 ECF No. 24 at

page 6 (Espresso Management Holding, Inc.), ECF No. 26 at page 6 (Espresso

Stores, Inc.), ECF No. 28 at page 6 (F-6 Chelsea, Inc.), ECF No. 30 (AF-1 LLC) at

page 6, ECF No. 32 (AF-22 LLC) at page 6.  In the sections that required him to

list any directors, officers, or members of the Franchisee Debtors, he again listed

only himself.  *Id.*

- With the exception of AF-22 LLC, Levi admits that he is a director—along with

  Yoav Tal and Avi Castro—of each of the Franchisee Debtors.  PTO Annex A ¶ 44

  (AF-1 LLC), ¶ 49 (Espresso Management Holding), ¶ 52 (Espresso Stores, Inc.),

  and ¶ 55 (F-6 Chelsea, Inc.).

Levi's disclosures at the time of the Franchisee Debtors' bankruptcy filings (which were

made in a desperate effort to stave off a closure of the stores that the state court had ordered) are

particularly telling.  There, as noted above, Levi listed only himself as a person with interests in

the Franchisee Debtors.  Yet in his own bankruptcy disclosures, several months earlier, with the

exception of AF-1 LLC (which he stated was his employer), Levi made no mention of those

companies or of his interests in them.

Levi now contends that he did not actually have ownership interests in the companies.

However, Levi has not even been consistent over time in identifying who the alleged owners were.

He now claims that AF-1 LLC is owned by Tal and Castro, a third cousin and a friend (PTO Annex

C ¶ 1; Annex A ¶ 27, 28), but in his sworn testimony at the creditor meeting Levi stated that the

business was owned by unidentified members of his and his wife's family, suggesting at times that

he was not even sure who the owners were.  PX 15 at page 18.  Notably, Levi offered no

documentary evidence, or testimony, or acknowledgment of any kind that any person other than himself actually has an ownership interest in the Franchisee Debtors.

Levi contends that his prior statements that he was a "principal" and a "member" of each Franchisee Debtor should not be held against him because English is not his primary language and he simply did not know the significance of the terms "principal" and "member." *E.g.*, Annex C to the PTO ¶ 4.  However, Levi certainly understood the significance of his prior statement that he owned 51% of the ownership interests in two of the Franchisee Debtors.  Levi admittedly had extensive business dealings in the United States since 2003.  Annex C to the PTO ¶¶ 29-38.  His involvement with various businesses included the importation of shoes from China, a major real estate development project, and a business venture to open falafel stores.  *Id.*  Levi was no stranger to substantial monetary transactions, having borrowed hundreds of thousands of dollars and guaranteed others' debt in excess of $40 million.  *E.g.*, Annex C to the PTO ¶ 38.  Given his significant business experience in the United States, the Court does not find Levi's contentions that he did not understand the meaning of the terms "principal" and "member" to be credible.

Levi also contended that Filicori inserted the descriptions of Levi as 51% owner and "member" without Levi's knowledge and that, in his brief review of the franchise agreements, he did not notice these descriptions.  In that vein, Levi notes, for example, that the pages that refer to him as owning a 51% interest do not bear his initials, while other pages in the agreements do.  The Court finds, to the contrary, that the agreements prominently refer to Levi as the Franchisee Debtors' principal and contain default provisions that describe, in some detail, the significance of the "principal" and the importance of the principal's role in conducting the franchised business.  Levi's contention that he was not aware of the descriptions of his role are not credible.

Levi also contended at trial that Filicori knew that Levi was not the actual owner of the Franchisee Debtors, and that the relevant language in the franchise agreements was included at Filicori's insistence, in order to appease a Filicori principal in Italy who would not enter into the franchise agreements unless Levi (whom Filicori had actually met) represented himself to be an owner of the companies. It must be emphasized that this testimony directly contradicts Levi's separate testimony (a) that he did not understand the significance of the "principal" and "member" references, and (b) that he allegedly was unaware, when he signed the agreements, that they referred to him as a principal and (in some cases) member and/or principal owner of the Franchisee Debtors. This particular testimony constitutes an admission that Levi knew the meaning and the significance of the representations. Levi contends (in effect) that the statements were false and that he made them only for the purpose of defrauding another Filicori representative. The Court does not find this explanation to be credible. Levi correctly stated his interests in the Franchisee Debtors in the franchise agreements that he signed prior to the entry of a large state court judgment against him.

Levi also argues that there is no operating or other similar agreements listing him as the Franchisee Debtors' owner. That argument might have carried some weight if operating agreements had been drawn up and listed other people as the Franchisee Debtors' owners. But Levi admits that operating or similar agreements never existed. This was consistent with Levi's general desire to avoid creating evidence of his ownership of assets that might be seized by judgment creditors.

Levi next points to the fact that he was not a signatory on any of the Franchisee Debtors' bank accounts and did not authorize a single payment on their behalf. However, the Court does not accept the notion that this somehow is evidence that Levi did not own the Franchisee Debtors.

Levi acknowledged in his testimony that he did not want to create assets that could be seized to satisfy the large outstanding judgment against him.  The use of bank accounts that were not in his name is just evidence of his intent to avoid creditors, rather than evidence that Levi actually lacked an ownership interest.

Finally, Levi points out that as of the time of the trial, he was three months behind on his rent, which, according to him, negates any possibility that he secretly derived some financial benefit from his alleged undisclosed interest in the Franchisee Debtors.  But at the time he filed the relevant Written Disclosures Levi was still operating the Franchisee Debtors and still attempting to derive profits from their operations.  Creditors were entitled to know of the existence of those businesses and to make their own decisions as to whether they represented assets that might have been salvaged and that might have permitted a larger recovery on the creditors' claims.

Given the facts in evidence, and the many prior statements by Levi himself, the Court concludes that Levi was the majority owner (if not the sole owner) of each of the Franchisee Debtors.

Levi also took steps to conceal his ownership interests in the Franchisee Debtors and to conceal the income he derived from operating them, and he did so in order to frustrate creditors in the collection of legitimate debts.  Levi stated, in his bankruptcy schedules, that he had income of approximately $62,000 between January 1, 2015 and April 7, 2016.  However, he admitted that he made arrangements to avoid having payments of compensation made directly to him.  Instead, at Levi's direction, money was paid directly by third parties to Levi's landlord and to other creditors. Levi kept the full benefit of the money he earned and the right to direct its use, but avoided any potential garnishment by creditors.  Levi admitted at trial that he did not maintain a bank account or other assets in his own name, and that he caused payments to be made in this way, in order to

21

keep creditors (particularly his judgment creditor) from knowing of the income and enforcing their rights against it. Through this arrangement, Levi actively and intentionally concealed his income, and the fact that such income was connected to his interests in the Franchisee Debtors, for the purpose of hindering or delaying the collection of legitimate debts.

The evidence is undisputed that these practices began more than one year prior to the bankruptcy filing but that they persisted well into the one-year period. Specifically, Levi stipulated that the following are fourteen checks totaling $68,450 from AF-1, LLC, AF-2, LLC, A Stores NY, LTD., Lola 339 East Fordham Road, Inc., Lola 8 West, Ltd., and Pakod, Inc. to Juvenal L. Marchisio for rent for Levi's apartment, each issued within the relevant timeframe:

| Payor | Date | Check No. | Bank | Amount |
|---|---|---|---|---|
| Lola 8 West, Ltd. | 4/24/2015 | 0790 | TD Bank | $4,750.00 |
| Lola 8 West, Ltd. | 5/22/2015 | 0811 | TD Bank | $4,900.00 |
| AF-1, LLC | 7/27/2015 | 11325 | Metropolitan | $4,900.00 |
| AF-1, LLC | 8/10/2015 | 11426 | Metropolitan | $4,900.00 |
| Lola 8 West, Ltd | 11/10/2015 | 1011 | TD Bank | $4,900.00 |
| Lola 8 West, Ltd. | 12/10/2015 | 1049 | TD Bank | $4,900.00 |
| AF-2, LLC | 1/10/2016 | 1013 | Metropolitan | $4,900.00 |
| Lola 8 West, Ltd. | 3/1/2016 | 1152 | TD Bank | $4,900.00 |
| Lola 8 West, Ltd. | 4/1/2016 | 1215 | TD Bank | $4,900.00 |
| Lola 8 West, Ltd. | 4/28/2016 | 1257 | TD Bank | $4,900.00 |
| A Stores NY Ltd. | 5/27/2016 | 1049 | Metropolitan | $4,900.00 |

| Payor | Date | Check No. | Bank | Amount |
|---|---|---|---|---|
| Lola 8 West, Ltd. | 6/29/2016 | 1015 | TD Bank | $4,900.00 |
| Pakod Inc. | 7/29/2016 | 1031 | Metropolitan | $4,900.00 |
| Lola 8 West, Ltd. | 8/29/2016 | 1117 | TD Bank | $4,900.00 |
| Total | | | | $68,450 |

The Trustee therefore has sustained her burden of showing that Levi concealed property (his income and his interests in the Franchisee Debtors) during the one year prior to the bankruptcy petition, and that Levi did so with the intent to hinder or delay creditors.

### B.    Post-Bankruptcy Concealment

Nowhere in his Written Disclosures did Levi so much as mention four of the five Franchisee Debtors.  There were numerous questions in the SOFAs and the Schedules that were meant to elicit disclosure of Levi's connections to the Franchisee Debtors, yet Levi did not make the required disclosures.  For example, Levi was obliged to list the assets he owned; in response, he only listed (i) less than $4,000 worth of personal property; and (ii) a 50%  membership interest in FDB 124, LLC (a hotel business), which he indicated had no value (ECF No. 4 at pages 1, 4-6). He also represented in his Written Disclosures that he had no interest in any other incorporated or unincorporated businesses, whether LLCs, partnerships, or joint ventures.  (ECF No. 4 pages 4-6.) Levi did state that in the four years before filing for bankruptcy, he had been a member of Espresso Dream, LLC (which he identified as an espresso bar and which the parties concede held the leases for the five coffee shop locations), but he did not identify this membership interest as a present asset (ECF No. 4 at pages 1, 4-6) and also did not otherwise indicate any other connections to any business, whether as a "member of a limited liability company (LLC) or limited liability partnership (LLP), a partner in a partnership, an officer, director, or managing executive of a

corporation, [or] an owner of at least 5% of the voting or equity securities of a corporation." (ECF No. 5 at pages 6-7.)

Levi's failure to disclose his ownership interests in the Franchisee Debtors, when he had a duty to do so, was willful and intentional and done for the purpose of concealing assets from creditors and from the Trustee, in the hope (at the time of Levi's bankruptcy filing) that he could avoid having to apply those assets to the payment of his creditors' claims. The state court had not yet issued a closure order and Levi was continuing to run the espresso franchises at the time of his bankruptcy filing. Levi was a judgment debtor in the action filed by Skurry, and at his deposition and at the trial Levi acknowledged that Skurry was aggressively pursuing collection efforts and that Levi conducted his affairs deliberately in a way that would minimize Skurry's ability to find and execute on Levi's income and property. It was for that reason (by Levi's own admission) that he did not keep bank accounts in his own name and did not keep property in his name. Levi's vague and evasive testimony at the 341 meeting as to the owners of AF-1 LLC– made at a time when Levi was still operating the shops and still hoped to salvage them as valuable businesses – is further evidence of his intent to conceal assets, and to hinder or delay creditors.

Levi argues that the disclosures that he made when the Franchisee Debtors filed their own bankruptcy cases are evidence that he was not trying to conceal information about his interests in the companies – a strange statement, given that Levi's primary contention at trial was that the statements about his interests that he made when the Franchisee Debtors filed their own cases were incorrect, and that other people were the real owners. In any event, the fact that Levi disclosed information once the closure of the businesses was imminent, in a last-ditch effort to block a state court ruling through a bankruptcy filing, hardly undercuts the evidence that he intentionally

concealed the same information at an earlier time and that he did so with the intent of hindering and delaying creditors and the Trustee.

Finally, Levi contended that his counsel advised him, before he filed the Written Disclosures, that because Levi was not listed as an owner in any operating agreement and was not a signatory on any of the bank accounts, he did not have any disclosable affiliation with the Franchisee Debtors. Levi offered no corroboration that any such advice was ever given, and the Court did not find Levi's testimony on the issue to be credible.

## ANALYSIS OF THE "FALSE OATH" CLAIM

The Trustee also asserts that a discharge should be denied under Section 727(a)(4)(A) on the separate and independent ground that Levi made false oaths in his Written Disclosures and at his 341 meeting about (i) his household income; and (ii) his equitable interest in the Franchisee Debtors.

As noted above, a false statement must be "material" in order to support the denial of a discharge. *E.g.*, *In re Gordon*, 535 B.R. 531, 538 (S.D.N.Y. 2015). The Court does not find that Levi's failure to list his wife's income in his Written Disclosures is a separate basis for denying him the discharge, because that omission (even if it was made knowingly and with intent to defraud) in and of itself was not material. The Trustee has not shown that that information bears on the discovery of estate property or the debtor's business dealings. *See In re Irving*, 27 B.R. 943, 946 (Bankr. E.D.N.Y. 1983) (citing *Gannon*, 173 B.R. at 319 20).

The Court does, however, find that Levi knowingly and fraudulently made several false statements under oath in trying to conceal his interest in the Franchisee Debtors. Below are the questions that Levi answered falsely:

| Question | Levi's Answer | What Would Have Been an Accurate Answer |
|---|---|---|
| Total Value of personal property you own (ECF No. 4 at 1) | $3,750 | This included Levi's clothing and household items as well as a limited amount of cash.  Levi should have disclosed that this amount does not include the value of his interests in the Franchisee Debtors. |
| Do you have any legal or equitable interest in non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture. (ECF No. 4) | Yes.  50% membership interest in FDB 124, LLC | Levi should have listed his equitable interests in the Franchisee Debtors: AF-1 LLC, AF-22 LLC, Espresso Management Holding, Espresso Stores, Inc., and F-6 Chelsea, Inc. |
| Do you have other property of any kind you did not already list? (ECF No. 4) | No | The interests in the Franchisee Debtors were not listed and should have been disclosed. |
| Did you have any income from employment or from operating a business during this year or the two previous calendar years?  Fill in the total amount of income you received from all jobs and all businesses, including part-time activities.  (ECF No. 5 at page 1) | Yes. $12,000 from operating a business since January 1, 2016 $50,000 from operating a business in 2015 and $50,000 from operating a business in 2016 | Levi testified at his deposition in this adversary proceeding that this amount did not include what was paid to his landlord directly, Dep. Tr. at 65:23-66:11 (August 9, 2017), and the record otherwise discloses that Levi's rent was $4,900 a month.  Levi should have disclosed amounts paid to his landlord directly as income. |
| Did you receive any other income during this year or the two previous calendar years? (ECF No. 5 at page 3) | No. | This was another opportunity for Levi to reveal that some of his income was paid directly to his landlord and was not included in the amounts listed above. |

| Question | Levi's Answer | What Would Have Been an Accurate Answer |
|---|---|---|
| Give details about your business or connections to any business: Within 4 years before you filed for bankruptcy [i.e., since April 7, 2012], did you own a business or have any of the following connections to any business? A member of a limited liability company or a limited liability partnership? A partner in a partnership? An officer, director, or managing executive of a corporation? (ECF No. 5 at pages 6-7) | Levi stated that he had been a member of 124 FDB, LLC and Espresso Dream LLC | He did not identify any of the Franchisee Debtors, did not disclose his interests in them, and did not disclose that he was (as he now admits) their director and manager. Annex A to Joint PTO ¶¶ 44 (director of AF-1 LLC), 49 (director of Espresso Management Holding), 52 (director of Espresso Stores, Inc.), 55 (director of F-6 Chelsea, Inc.). |

As noted above, to prevail on the "false oaths" claim, the Trustee must show that when the Debtor made false statements under oath, he acted with actual fraudulent intent and that the falsehoods were material. In addition, as in the case of all discharge objections, evidence must be construed strictly in Levi's favor. Here, even when the evidence is construed in the light most favorable to Levi, it shows that Levi acted fraudulently and with a deliberate, knowing intent to conceal the true facts. In addition, his misstatements and omissions were material. Not only were the Franchisee Debtors a valuable asset (as evidenced by the fact that Levi himself valued their litigation claims against Filicori at $1 million each), but the information Levi omitted would have materially assisted the Trustee in identifying all property of the Debtor's estate. Perhaps the businesses might have failed anyway – but the point is that we will never know if that would have been the case, or if creditors could have recovered more value if the proper disclosures had been made. *Cf. Borges v. Placeres (In re Placeres)*, No. 15-01356, slip op. at 28 (Bankr. S.D.N.Y. December 5, 2017) (in denying pursuant to Section 727(a)(4)(A) discharge, noting that the debtor's failure to disclose a malpractice claim against a third party inappropriately assumed the

trustee's role of deciding what information was important and undercut the trustee's ability to do his job); *O'Connell v. DeMartino (In re DeMartino)*, 448 B.R. 122, 130 (Bankr. E.D.N.Y. 2011) ("It is not for a debtor to determine whether called for information is immaterial, unimportant or of no benefit to creditors."). "Materiality" merely requires a showing that the relevant information was something that creditors and the trustee reasonably would have regarded as significant in identifying the assets of the estate that could be liquidated and used to satisfy claims, and Levi's interests in the Franchisee Debtors met that test. *See In re Gordon*, 535 B.R. 531, 538 (S.D.N.Y. 2015) (materiality depends on whether the information is pertinent "to the debtor's business transactions, or if it concerns the discovery of assets, business dealings, or the existence or disposition of the debtor's property") (internal citation omitted).

## CONCLUSION

For the reasons set forth above, the Court finds in favor of the Trustee.  Pursuant to 11 U.S.C. §§ 727(a)(2) and 727(a)(4)(A), Levi is not entitled to a discharge of his debts.

Dated:  New York, New York
        December 11, 2017

/s/ Michael E. Wiles
THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE